KRISTEN K. WAGGONER, WA Bar 27790
RYAN J. TUCKER, AZ Bar 034382*
JEREMIAH GALUS, AZ Bar 030469*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kwaggoner@adflegal.org
rtucker@adflegal.org
jgalus@adflegal.org

DAVID A. CORTMAN, GA Bar 188810*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org

*Admitted pro hac vice

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **CHRIST'S CHURCH OF MT. SPOKANE; WESTGATE CHAPEL,**<br>　　　　*Plaintiffs*,<br><br>v.<br><br>**JAY INSLEE**, in his official capacity as Governor of Washington; **ROBERT FERGUSON**, in his official capacity as the Attorney General of Washington; **BRET D. DAUGHERTY**, in his official capacity as Adjutant General; | Case No.: 2:20-cv-00197<br><br>Judge Thomas O. Rice<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Requested |

1  **JOHN BATISTE**, in his official
2  capacity as Chief of the
   Washington State Patrol, **OZZIE**
3  **KNEZOVICH**, in his official
4  capacity as Sheriff of Spokane
   County, **ADAM FORTNEY**, in his
5  official capacity as Sheriff of
6  Snohomish County,
                    *Defendants.*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1
2

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................i

TABLE OF AUTHORITIES .............................................................ii

INTRODUCTION ......................................................................1

STATEMENT OF FACTS ..............................................................3

   A. The Churches and their religious services ...................................3

   B. Orders prohibiting and restricting religious services ..................6

   C. Exemptions and favorable treatment for secular activity ...........9

LEGAL STANDARD ..................................................................13

ARGUMENT .........................................................................14

  I. The Churches are likely to succeed on the merits of their claims. 14

   A. The Religious Restrictions violate the Free Exercise Clause. ....14

   B. The religious restrictions violate the Churches' free speech and assembly rights. ...................................................................29

   C. The religious restrictions fail strict scrutiny..............................31

  II. The Church has already suffered and will continue to suffer irreparable harm without an injunction..............................................33

  III. The balance of equities sharply favors the Churches. ...............33

  IV. An injunction will serve the public interest. ...........................34

CONCLUSION ......................................................................34

Certificate of Service .............................................................36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# TABLE OF AUTHORITIES

**Cases**

*Antietam Battlefield KOA v. Hogan,*
     No. 1:20-cv-01130, 2020 WL 2556496 (D. Md. May 20, 2020); ..... 19

*Calvary Chapel Dayton Valley v. Sisolak,*
     No-20-16169, 2020 WL 7350247 (9th Cir. Dec. 15, 2020) .. 1, 15, 16, 29

*Calvary Chapel of Bangor v. Mills,*
     No. 1:20-cv-00156, 2020 WL 2310913 (D. Me. May 9, 2020)......... 19

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
     508 U.S. 520, 542 (1993) ...................................................... *passim*

*Cross Culture Christian Center. v. Newsom,*
     No. 2:20-cv-00832, 2020 WL 2121111 (E.D. Cal. May 5, 2020)..... 19

*Employment Division, Department of Human Resources of Oregon v.*
     *Smith,*
     494 U.S. 872, 884 (1990)  ...................................................... 25, 26

*Harvest Rock Church v. Newsom,*
     No. 20A94, 2020 WL 7061630 (U.S. Dec. 3, 2020)........................ 28

*High Plains Harvest Church v. Polis,*
     No. 20A105, 2020 WL 7345850 (U.S. Dec. 15, 2020)..................... 28

*Jacobson v. Massachusetts,*
     197 U.S. 11 (1905) ....................................................................... 27

*Koller v. Brown,*
     224 F. Supp. 3d 871 (N.D. Cal. 2016) ........................................... 14

*Lovell v. City of Griffin,*

    303 U.S. 444 (1938) ......................................................................... 29

*Maryville Baptist Church v. Beshear,*

    No. 3:20-cv-278, 2020 WL 1909616 (W.D. Ky. Apr. 18, 2020) ....... 19

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commision,*

    138 S. Ct. 1719 (2018) ............................................................. 23, 25

*McDaniel v. Paty,*

    435 U.S. 618 (1978) ......................................................................... 16

*Melendres v. Arpaio,*

    695 F.3d 990 (9th Cir. 2012) .................................................. 14, 34

*Reed v. Town of Gilbert,*

    576 U.S. 155 (2015) ......................................................................... 29

*Roberts v. Neace,*

    958 F.3d 409 (6th Cir. 2020) ................................................... 24, 25

*Robinson v. Murphy,*

    No. 20A95, 2020 WL 7346601 (U.S. Dec. 15, 2020) ....................... 28

*Roman Catholic Diocese of Brooklyn v. Cuomo,*

    No. 20A87, 2020 WL 6948354 (U.S. Nov. 25, 2020) ............. *passim*

*Sanders County. Republican Center Committee v. Bullock,*

    698 F.3d 741 (9th Cir. 2012) ...................................................... 31

*Sherbert v. Verner,*

    374 U.S. 398 (1963) ...................................................................... 26

*Soos v. Cuomo,*

    No. 1:20-cv-651, 2020 WL 3488742 (N.D.N.Y. June 26, 2020) ...... 19

*South Bay United Pentecostal Church v. Newsom*,

    No. 20-55533, 509 U. S. ___, 2020 WL 2813056 (May 29, 2020)

    .................................................................................. *passim*

*South Oregon Barter Fair v. Jackson County, Oregon*,

    372 F.3d 1128 (9th Cir. 2004) ....................................................... 30

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,

    137 S. Ct. 2012 (2017) .................................................................. 16

*Widmar v. Vincent*,

    454 U.S. 263 (1981) ....................................................................... 29


**Statutes**

WASH. REV. CODE § 9.92.020 (2020) ..................................................... 6


**Other Authorities**

*10-Day Weather for Mead, Washington*, The Weather Channel,

    https://bit.ly/38qHPNp (last accessed Dec. 16, 2020) ...................... 4

Governor Jay Inslee, *Address Regarding Demonstrations* (June 1, 2020),

    https://www.pscp.tv/w/1OyJAYjMnBgJb................................. 12, 21

Governor Jay Inslee, *Press Conference on Covid-19* (June 4, 2020),

    https://bit.ly/2IWoxGJ ....................................................... 13, 21, 31

Governor Jay Inslee, *Press Conference on Covid-19* (June 8, 2020),

    https://bit.ly/3qXWZ4W ......................................................... 13, 30

*Risking your health to fight racism (Thank you!)*, Medium (Jun. 2,

    2020), https://medium.com/wadepthealth/risking-your-health-to-

    fight-racism-thank-you-7a528a692f81 ......................................... 13

Seattle Times Staff, *Seattle-area protests: Police declare a riot as demonstrators gather for fourth day to call for police accountability*, THE SEATTLE TIMES (updated June 2, 2020), https://bit.ly/2LF93rD. ..................................................... 12, 21, 30

# INTRODUCTION

Three weeks ago, the Supreme Court in *Roman Catholic Diocese of Brooklyn v. Cuomo* made clear that "even in a pandemic," the Free Exercise Clause is not "put away and forgotten." No. 20A87, 2020 WL 6948354, at *3 (U.S. Nov. 25, 2020). Not only did *Diocese of Brooklyn* bring to an end the lower courts' leaning on the 100-year-old *Jacobson* decision to displace modern constitutional analysis, but the Supreme Court also made clear that secular comparators to a church are not limited to other churches or even movie theaters, lectures, concerts, and the like. They also include businesses such as retails stores, manufacturers, professional offices, transportation facilities, garages, hardware stores, bike repair shops, signage companies, liquor stores, and acupuncturists. *Id.* at *2; *see also id.* at *4 (Gorsuch, J., concurring). The Ninth Circuit Court of Appeals followed suit, reversing a district court decision upholding Nevada's COVID-19 restrictions, which allowed casinos and other businesses to operate at 50% of their building capacity while limiting houses of worship to 50 people, regardless of the size of their building. *Calvary Chapel Dayton Valley v. Sisolak*, No-20-16169, 2020 WL 7350247, at *4-*5 (9th Cir. Dec. 15, 2020). But Governor Inslee has not heeded that direction.

Rather than amend his proclamation to treat houses of worship less harshly than comparable secular facilities, Governor Inslee doubled down. On December 10, 2020, Governor Inslee issued Proclamation 20-25.9, extending his prior restrictions until January 4, 2021. Attached as **Exhibit 1**. These "temporary" orders restrict indoor religious services to "25 percent of indoor occupancy limits, or no more than 200 people,

whichever is fewer," and impose specific liturgical restrictions prohibiting indoor congregational singing, choirs, bands, ensembles, and any music beyond a single vocalist with a single accompanist. *Id*. at 4. This means Westgate Chapel, with a fire code capacity of 3,370 for its entire facility, can only accommodate less than 9% in its buildings and cannot include a worship band at its services, no matter how far apart they are socially distanced.

Many secular businesses and activities, on the other hand, receive exemptions and more lenient treatment under the Governor's orders. First, the Governor's orders grant de facto gathering exemptions to at least 158 broad categories of activity that the Governor deems "essential." An unlimited number of people are permitted to visit, work at, and patronize "essential" operations including airports, subways, cannabis retailers, breweries, wineries, coffee production facilities, company cafeterias, and media operations. *See* Proclamation 20-25.9, Ex. 1, at 3 (extending Proclamation 20-25); Proclamation 20-25, ECF No. 33-3 at 4 ("All essential businesses are encouraged to remain open and maintain operations"); Essential Workers List, ECF No. 33-4 at 1-12 (listing activity deemed "essential").

This discriminatory treatment of religion must end immediately. In the ten months since the COVID-19 pandemic began, state executives have consistently imposed more severe burdens on religious conduct than comparable secular activities. As Washington's religious organizations struggle to worship and serve their congregations under unique capacity restrictions, no such restrictions apply for at least 158 businesses and activities that the Governor considers "essential," including cannabis

retailers, coffee roasters, liquor stores, bicycle shops, breweries, wineries, and big-box stores.

Even "non-essential" activities like restaurants, convention centers, professional offices, and "personal services" (including tattoo parlors, nail salons, barbershops, and hair salons) have received more favorable treatment. Indeed, for months Governor Inslee has granted restaurants *twice* the capacity allowed for churches with no numerical cap, assuring diners that they may gather around the same table with people from different households. No such accommodation applies for families wishing to gather at the Lord's table. "Who knew public health would so perfectly align with secular convenience?" *Diocese of Brooklyn,* 2020 WL 6948354, at *4 (Gorsuch, J., concurring).

Plaintiffs Westgate Chapel ("Westgate") and Christ's Church of Mt. Spokane ("Christ's Church") (collectively "the Churches") plan to worship indoors at 50% capacity with strict social distancing and hygiene protocols to govern their services. But despite these measures, Defendants threaten the Churches with criminal penalties including imprisonment up to one year and fines up to $5,000.00. An injunction is needed to preserve the Churches' constitutional rights and allow them to safely worship consistent with their religious beliefs.

## STATEMENT OF FACTS

### A.    The Churches and their religious services

Westgate is located in Snohomish County and has served its community for over 61 years. Decl. of Alec Rowlands, attached as **Exhibit 2**, ¶¶ 1, 3. Westgate is proud of its multicultural community, including members representing at least 62 nations. *Id.* ¶ 5. In addition

to its corporate worship, Westgate contributes to its community by maintaining a food and clothing bank, serving the homeless and people with special needs, and hosting a "healing and recovery" group support people struggling with drug abuse, alcoholism, and addiction.[1] *Id.* ¶ 6. And Christ's Church, located in Spokane County, has served its community for nearly 20 years through corporate worship and service. Decl. of Peter Hull, attached as **Exhibit 3**, ¶¶ 1, 3.

The Churches believe that the Bible is the inspired Word of God and sole authority for faith and practice. Ex. 2, ¶ 7; Ex. 3 ¶ 5. The Churches sincerely believe that the Bible commands Christians to gather in person for corporate worship, and that such gatherings cannot be substituted with remote viewing. Ex. 2, ¶¶ 8-11; Ex. 3, ¶¶ 6-9. Neither virtual nor drive-in services are feasible due to the Churches' lack of broadcasting resources and some parishioners' lack of internet access. Ex. 2, ¶ 12; Ex. 3, ¶¶ 10-11. Outdoor services are also impracticable for the Churches due to inclement weather,[2] noise from nearby traffic, and

---

[1] The Governor's orders and guidance classify as "essential" workers providing clothing, food, and support for vulnerable populations to ensure their health and well-being. *See* Essential Workers List, ECF No. 33-4 at 2.

[2] The 10-day forecast for Christ's Church includes freezing temperatures, rain, and snow. *See* 10-Day Weather for Mead, Washington, *The Weather Channel*, https://weather.com/weather/tenday/l/be33741592cdb4b0d08e3f99fc46259355a0cb47163614e149ade17cd2aef91a (last accessed Dec. 16, 2020).

the inability of attendees with reduced mobility to traverse areas where outdoor services could be held. Ex. 2, ¶ 13; Ex. 3, ¶ 12.

Westgate has a total fire code capacity of 3,370 for its facility. Ex. 2, ¶ 14.[3] And it currently holds worship services in two separate rooms, each with its own egress, ingress, and restrooms. *Id.* ¶ 15. These spaces include a sanctuary that seats 1300 people and a fellowship hall that seats 400 people. *Id.* Westgate seeks to hold indoor services at up to 50% of capacity in these areas (up to 650 people in the sanctuary and up to 200 people in the fellowship hall) and has configured its seating to provide for proper social distancing of at least six feet separation between families and individuals. *Id.* ¶¶ 17, 28.

Christ's Church has total fire code capacity of approximately 218 for its facility, and primarily holds worship services in its sanctuary with capacity of approximately 110 people. Ex. 3, ¶¶ 13-14. With Christmas soon upon us, Christ's Church plans to hold indoor services at 50% of its sanctuary's capacity (about 55 people) and has configured its seating to provide for proper social distancing of at least six feet separation between families and individuals. *Id.* ¶ 16, 26.

The Churches have adopted—and will follow—strict social distancing and health and safety protocols. Ex. 2, ¶ 16; Ex. 3, ¶ 15. To ensure proper social distancing, the Churches have provided for at least six feet of separation between each individual or family. Ex. 2, ¶ 17; Ex.

---

[3] Under the Governor's current proclamation, that means Westgate can only accommodate less than 2% of its fire code capacity and just 2.9% of its sanctuary seating. *See* Ex. 2, ¶¶ 22-23.

3, ¶ 16. In addition, the Churches' protocols include using a single entrance with doors already open, advising attendees of social distancing protocols, asking attendees to wear face coverings, providing hand sanitizer, using prepackaged communion elements, and sanitizing the sanctuary, hallways, bathrooms, and common surfaces before and after each service. Ex. 2, ¶ 18; Ex. 3, ¶ 17.

**B.    Orders prohibiting and restricting religious services**

On February 29, 2020, Governor Inslee declared a state of emergency in response to the Covid-19 outbreak, which remains in effect. *See* Proclamation 20-25.9, Ex. 1, at 1, 3.

***Orders prohibiting religious services.*** On March 23, 2020, Governor Inslee issued a statewide stay-home order (*Stay Home – Stay Healthy*), which prohibited in-person religious services of any size under threat of criminal penalties, including imprisonment for up to one year and fines in an amount up to $5,000.00. *See* Proclamation 20-25, ECF No. 33-3 § 2; WASH. REV. CODE § 9.92.020 (2020). Governor Inslee issued two subsequent orders extending his wholesale prohibition of in-person religious services through May 4, 2020. *See* Proclamations 20-25.1 and 20-25.2, ECF Nos. 33-5 & 33-6. Under these first three *Stay Home – Stay Healthy* orders, Governor Inslee closed or severely restricted operations that he deems "non-essential" but encouraged operations that he deems "essential" to remain open. Proclamation 20-25, ECF No. 33-3 at 4. The list of activity that Governor Inslee deems "essential" is fourteen pages long and identifies 158 categories of operations spanning thirteen broad sectors of the economy, but the list omits religious worship services. *See* Essential Workers List, ECF No. 33-4.

***Restrictions on in-person religious services.*** On May 4, 2020, Governor Inslee issued Proclamation 20-25.3 (later named *Safe Start – Stay Healthy*), which introduced the State's original four-phase county-by-county "Safe Start Plan." *See* Proclamation 20-25.3, ECF No. 33-7 at 3-4; Original Reopening Plan, ECF No. 33-8. Under Phase 1 of the original reopening plan, in-person church services of any size remained prohibited, and under Phase 2, spiritual gatherings were limited to 5 people regardless of building size. Original Reopening Plan, ECF No. 33-8 at 7. The original reopening plan allowed counties to apply for a variance to proceed through the phases more quickly. *Id.* at 6, 8-9. The Washington State Department of Health granted variances allowing Spokane and Snohomish Counties to advance to Phase 2 on May 22, 2020 and June 5, 2020, respectively. *See* Spokane County Variance, ECF No. 33-10; Snohomish County Variance, ECF No. 33-12.

Governor Inslee later issued four more *Safe Start – Stay Healthy* orders extending and adjusting his four-phase Safe Start Plan. *See* Proclamation 20-25.4, attached as **Exhibit 4**; Proclamation 20-25.5, attached as **Exhibit 5**; Proclamation 20-25.6, attached as **Exhibit 6**; Proclamation 20-25.7, attached as **Exhibit 7**. While the original reopening plan enumerated restrictions for religious services and other activities, these subsequent *Safe Start – Stay Healthy* orders refer the public to industry-specific guidance documents. *See, e.g.,* Proclamation 20-25.4, Ex. 4, at 4. The above-referenced proclamations expressly provide that Governor Inslee may change the restrictions imposed on religious activity, "reinstat[ing] the prohibitions established in earlier proclamations" (some of which completely prohibited in-person services),

"returning any or all counties to a prior phase," or issuing new guidance. *See* Proclamation 20-25.7, Ex. 7 at 5-6. The orders also provide that "violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5)." *See id* at 6.

To date, Governor Inslee has issued four guidance documents imposing restrictions specifically for "Religious and Faith-based Organizations." The first guidance document described religious services as "COVID-19 'superspreader' events" and restricted in-person religious services in Phase 2 counties to "25% capacity or 50 individuals, whichever is less." *See* First Religious Guidance (May 27, 2020), ECF No. 33-13, at 1. The remaining guidance documents restricted in-person religious services in Phase 2 counties to 25% capacity or 200 individuals, whichever is less. *See* Second Religious Guidance (June 18, 2020) (updated Aug. 10, 2020), ECF No. 33-14 at 1; Third Religious Guidance (Oct. 21, 2020), ECF No. 33-15 at 1; Fourth Religious Guidance (Dec. 2, 2020), attached as **Exhibit 8**, at 1. Notably, the third guidance document allowed houses of worship to simultaneously host multiple services in separate rooms with their own entrance and restrooms. *See* Third Religious Guidance, ECF No. 33-15 at 1. All of the guidance documents include an official encouragement that all worship services be held remotely. *See* Ex. 8, at 1.

***Current "temporary" restrictions expiring January 4, 2020.*** On November 15, 2020, Governor Inslee issued Proclamation 20-25.8, announcing a four-week set of "temporary statewide restrictions" set to expire on December 14. Proclamation 20-25.8, attached as **Exhibit 9**; State Defendants' Answer to Second Amended Complaint, ECF No. 34 at

2-3 (describing the restrictions as "temporary"). On December 10, 2020, Governor Inslee issued Proclamation 20-25.9, amending and extending the restrictions from Proclamation 20-25.8 until January 4, 2020. *See* Proclamation 20-25.9, Ex. 1. These "temporary" orders restrict indoor religious services to "25 percent of indoor occupancy limits, or no more than 200 people, whichever is fewer," and imposed specific liturgical restrictions prohibiting indoor congregational singing, choirs, bands, ensembles, and any music beyond a single vocalist with a single accompanist. *See id.* at 4.

## C. Exemptions and favorable treatment for secular activity

Many secular businesses and activities receive exemptions and more lenient treatment under the Governor's orders. First, the Governor's orders grant de facto gathering exemptions to at least 158 broad categories of activity that the Governor deems "essential." An unlimited number of people are permitted to visit, work at, and patronize "essential" operations including airports, subways, cannabis retailers, breweries, wineries, coffee production facilities, company cafeterias, and media operations. *See* Proclamation 20-25.9, Ex. 1, at 3 (extending Proclamation 20-25); Proclamation 20-25, ECF No. 33-3 at 4 ("All essential businesses are encouraged to remain open and maintain operations"); Essential Workers List, ECF No. 33-4 at 1-12 (listing activity deemed "essential").

Second, although recent orders temporarily tightened restrictions on some secular activities, such restrictions were not in effect when the Churches filed their complaints, and even these elevated restrictions

grant more favorable treatment to comparable secular activities. For example, in-store retail operations, professional services, and personal services (including cosmetologists, cosmetology testing, hairstylists, barbers, estheticians, master estheticians, manicurists, nail salon workers, electrologists, permanent makeup artists, tanning salons, and tattoo artists) are all subject to a 25% capacity restriction, but without the numerical cap imposed on religious services. Proclamation 20-25.9, Ex. 1, at 4. Also, these temporary restrictions "do not apply to education (including but not limited to K-12, higher education, trade and vocational schools), childcare, recovery support groups, health care, and courts and judicial branch-related proceedings, all of which are exempt from the modifications…." *Id.* at 3.

Third, the Governor's prior orders and guidance—under which the Churches have operated for months, which were in effect when the Churches filed their Second Amended Verified Complaint, and which will resume upon expiration of the temporary restrictions—have consistently granted more favorable treatment to many "non-essential" businesses:

- **Manufacturing facilities** in Phase 2 counties may resume operations with no capacity or numerical restrictions, subject only to social distancing and hygiene protocols. *See* Current Reopening Plan, ECF No. 33-17 at 12; Manufacturing Guidance, ECF No. 33-18 at 1-4.

- **Restaurants and taverns** in Phase 2 counties may resume indoor dining up to 50% of capacity with no numerical cap, so long as there are only 6 people per table (*who may be from different households*)

and no bar seating. *See* Current Reopening Plan, ECF. No. 33-17 at 12; Restaurant Guidance, ECF No. 33-19 at 2.

- **Professional offices** in Phase 2 counties may reach 50% capacity with no numerical cap. *See* Current Reopening Plan, ECF No. 33-17 at 12; Professional Services Guidance, ECF No. 20 at 3.

- **Businesses offering personal services**—including tattoo parlors, barbershops, and hair or nail salons—may reach 50% capacity with no numerical cap in Phase 2 counties. *See* Current Reopening Plan, ECF No. 33-17 at 12; Personal Services Guidance, ECF No. 33-21 at 3.

- **"Miscellaneous venues"** in Phase 2 counties—including conference centers, convention halls, hotel meeting ballrooms, and sporting arenas—may reach 30% capacity, up to 200 people. *See* Miscellaneous Venue Guidance, ECF No. 33-23 at 1.

- **Movie theaters** in Phase 2 counties may operate at 25% capacity with no numerical cap, provided that social distancing and other health protocols are satisfied. *See* Current Reopening Plan, ECF No. 33-17 at 12; Movie Theater Guidance, ECF No. 33-22 at 1.

Fourth, the Governor admitted that he has granted exemptions and lenient treatment to protest gatherings. Thousands of Washingtonians gathered for protests and vigils related to the tragic death of George Floyd. The *Seattle Times* describes the protests as involving "seas" of people "gathering" to "listen to speeches," with photos showing protestors failing to comply with the State's gathering limits and social distancing

protocols.[4] Governor Inslee admitted that "[t]housands were protesting," but approved the gatherings based on the content of their message: "I want to thank the protesters who carried a peaceful and important message." May 31, 2020 Inslee Statement, ECF No. 33-24 at 1. When it came to protesters, Governor Inslee affirmed that "I fully support the right to free speech and peaceful assembly," and "[a]s people *gather* today to protest the unjust death of George Floyd, *I hope they do so* peacefully and safely." May 30, 2020 Inslee Statement, ECF No. 33-25 at 1. (emphasis added). Governor Inslee expressed his mere "hope" that protestors might wear a mask and "distance *as much as you can.*"[5]

Importantly, Governor Inslee admitted that supporting protest gatherings while prohibiting other gatherings does "appear to be contradictory," but that "thousands of people have made a decision that the virus of racism is important enough to fight back by peaceful protests and we have encouraged them to do so in the most distanced manner as

---

[4] *See* Seattle Times Staff, *Seattle-area protests: Police declare a riot as demonstrators gather for fourth day to call for police accountability*, THE SEATTLE TIMES (updated June 2, 2020), https://www.seattletimes.com/seattle-news/george-floyd-protests-continue-in-seattle-area-demonstrators-expected-to-gather-for-fourth-day-to-call-for-racial-justice/.

[5] Governor Jay Inslee, *Address Regarding Demonstrations* (June 1, 2020) (emphasis added), https://www.pscp.tv/w/1OyJAYjMnBgJb.

possible . . . ."[6] Governor Inslee stated that, at least for protesters, "there are some First Amendment rights that we have respected even though we do understand there have been some increased risks in any large gathering and we have respected people's rights in that regard . . . ."[7] The State's Department of Health acknowledged that the protest gatherings posed public health risks but nonetheless encouraged the risk-taking because it agreed with the content of the protesters' speech. The Department of Health published a blog post entitled "Risking your health to fight racism (Thank you!)," which stated, "If you were one of many people in communities across our state who responded to this violent act with outrage, frustration, and peaceful protest, thank you!"[8]

## LEGAL STANDARD

To obtain a preliminary injunction, the plaintiff must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public

---

[6] Governor Jay Inslee, *Press Conference on Covid-19* (June 8, 2020), https://www.tvw.org/watch/?clientID=9375922947&eventID=2020061125

[7] Governor Jay Inslee, *Press Conference on Covid-19* (June 4, 2020), https://www.tvw.org/watch/?clientID=9375922947&eventID=2020061053

[8] *Risking your health to fight racism (Thank you!)*, *Medium* (Jun. 2, 2020), https://medium.com/wadepthealth/risking-your-health-to-fight-racism-thank-you-7a528a692f81.

interest. *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012). To satisfy the "likelihood of success" element, the Churches do not have to "prove [their] case in full" or show that they are "more likely than not to prevail." *See e.g., Koller v. Brown*, 224 F. Supp. 3d 871, 875 (N.D. Cal. 2016) (internal citation and quotations omitted). Rather, the Churches need only show only that they have a "fair chance of success on the merits" or raise questions "serious enough to require litigation." *Id.* (internal quotations omitted).

## ARGUMENT

The Court should grant a preliminary injunction because the Churches are likely to succeed on the merits, they will suffer irreparable harm without relief, and both the equities and the public interest strongly favor the requested relief.

**I.    The Churches are likely to succeed on the merits of their claims.**

The Court should grant the Churches' motion because they are likely to succeed on the merits of one or more of their claims.

**A.    The Religious Restrictions violate the Free Exercise Clause.**

The Supreme Court recently granted injunctive relief to houses of worship challenging similar restrictions in New York, which imposed numerical caps on religious services while designating many secular activities as "essential" and granting more favorable capacity restrictions for even "non-essential" activity. *See Diocese of Brooklyn*, 2020 WL 6948354, at *1-4. There, the plaintiffs maintained that the order treated houses of worship more harshly than "comparable secular facilities." *Id*

at *1. The Supreme Court agreed, holding that the executive order was not "neutral" or of "general applicability" because it "single[d] out houses of worship for especially harsh treatment." *Id.* In reaching that holding, the Court determined that the favored comparators included businesses that New York had categorized as "essential" under its guidance—*e.g.*, acupuncture clinics, campgrounds, garages, certain manufacturing facilities, and all transportation facilities. *Id.* at *2.

Justice Gorsuch, who also joined the majority opinion, noted in his concurrence that New York's list of better-treated, "essential" businesses also included hardware stores, bicycle repair shops, certain signage companies, accounting firms, law firms, insurance agencies, laundromats, and liquor stores. *Id.* at *4 (Gorsuch, J., concurring). Even some "non-essential" businesses operated at capacities greater than places of worship. *Id.* at *2. The Supreme Court held that New York's categorizations of "essential" and "non-essential" activity "lead to troubling results" because large stores "could literally have hundreds of people shopping there on any given day" while religious organizations were prohibited from exceeding numerical caps. *Id.* (internal quotation marks omitted).

The Ninth Circuit recently followed suit, recognizing that the Supreme Court's decision in *Diocese of Brooklyn* represents a "seismic shift in Free Exercise law" that "compels" it to grant injunctive relief. *See Calvary Chapel*, 2020 WL 7350247, at *3. In *Calvary Chapel*, a church challenged Nevada's COVID-19 restrictions, which allowed casinos, retail businesses, bowling alleys, arcades, non-retail outdoor venues, gyms, fitness facilities, restaurants, breweries, distilleries, wineries, and

body-art and piercing facilities to operate at 50% of their building capacity, while limiting houses of worship to 50 people, regardless of building size. *Id.* at *2. The district court upheld the restrictions, but the Ninth Circuit reversed, holding that the restrictions triggered strict scrutiny because they treated some secular activities better than religious gatherings. *Id.* at *2-*4.

Here, Governor Inslee's COVID-19 orders warrant the same result. Because the Religious Restrictions "directly prohibit[ed]" the Churches' desired "religious activity," it strongly implicates the Free Exercise Clause. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017) (quotation omitted). Religious discrimination is "odious to our Constitution." *Id.* at 2025. Normally, that means "government may not use religion as a basis of classification for the imposition of duties, penalties, privileges or benefits." *McDaniel v. Paty*, 435 U.S. 618, 639 (1978) (Brennan, J., concurring). The Free Exercise guarantees religious believers—at a bare minimum—"[ ]equal treatment." *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 542 (1993). To determine whether a law treats religious believers and their practices equally, this Court directs courts to "survey meticulously" the law's text and "real operation." *Id.* at 531, 534, 535. A law that is not both neutral and generally applicable faces strict scrutiny. *Id.* at 531.

## 1. The Religious Restrictions trigger strict scrutiny because they are not generally applicable.

A law fails the general applicability requirement if it does not "prohibit nonreligious conduct that endangers [the state's] interests in a similar or greater degree than" the prohibited religious conduct. *Id.* at

543. At a minimum, the State cannot restrict worship services while "exempt[ing] or treat[ing] more leniently" secular activities that are "comparable," "where large groups of people gather in close proximity for extended periods of time." *S. Bay United Pentecostal Church v. Newsom*, No. 20-55533, 509 U. S. ___, 2020 WL 2813056, at *1 (May 29, 2020). Importantly, however, religious and secular comparators need not be identical in order for the court to recognize a Free Exercise violation. *See Diocese of Brooklyn*, 2020 WL 6948354, at *1-*2 (citing a range of secular comparators like transportation facilities and liquor stores with physical environments distinguishable from some religious services). Finally, "it does not suffice for a State to point out that, as compared to houses of worship, some secular businesses are subject to similarly severe or even more severe restrictions." *Id.* at *8 (Kavanaugh, J., concurring).

Defendants' orders and guidance fail the general applicability requirement for the same reasons the Supreme Court identified in *Diocese of Brooklyn*. First, like the unconstitutional restrictions in New York, Defendants categorize some activity as "essential" and "non-essential," which leads to the very same "troubling results." *Id.* Governor Inslee's list of "essential" activity is 14 pages long and covers more than 150 types of secular operations. *See* Essential Workers List, ECF No. 33-4, at 1-12. And Governor Inslee's categorization of "essential" operations includes *nearly every activity* that the Supreme Court found "troubling" in *Diocese of Brooklyn*, including transportation facilities, manufacturing facilities, hardware and home improvement stores, garages, bicycle repair shops, accounting firms, law firms, laundromats, and liquor stores. *Compare* Essential Workers List, ECF No. 33-4, at 1-12, *with Diocese of*

*Brooklyn*, 2020 WL 6948354, at *1-*5. In fact, Governor Inslee's list of "essential" operations goes even further, granting de facto gathering exceptions for cannabis retailers, breweries, wineries, coffee production facilities, company cafeterias, and media operations. *See* Essential Workers List, ECF No. 33-4 at 1-12. "Who knew public health would so perfectly align with secular convenience?" *Diocese of Brooklyn*, 2020 WL 6948354, at *4 (Gorsuch, J., concurring). "In [the Governor's] judgment laundry and liquor, travel and tools, are all 'essential' while traditional religious exercises are not. *That is exactly the kind of discrimination the First Amendment forbids.*" *Id.* (emphasis added).

Second, the Governor's restrictions are not generally applicable because even "non-essential" activities receive more favorable treatment than the Churches. *See id.* at *1-2 (per curiam). Even under the current "temporary" guidance set to expire on January 4, 2020, religious services are limited to 25% capacity with a hard cap of 200 people, regardless of building size. *See* Proclamation 20-25.9, Ex. 1, at 3. Meanwhile, in-store retail operations, professional services, and personal services (including cosmetologists, cosmetology testing, hairstylists, barbers, estheticians, master estheticians, manicurists, nail salon workers, electrologists, permanent makeup artists, tanning salons, and tattoo artists) are all subject to a 25% capacity restriction but without any numerical cap, and the temporary restrictions "do not apply to education (including but not limited to K-12, higher education, trade and vocational schools), childcare, health care, and courts and judicial branch-related proceedings, all of which are exempt from the modifications...." *Id.* at 3-4.

This disparate treatment is even more striking under the orders and guidance that were in effect when the Churches filed their Second Amended Verified Complaint, which are set to resume on January 4, 2020. *See* Second Am. V. Compl., ECF No. 33 (filed Nov. 16, 2020); Proclamation 20-25.8, Ex. 9, at 3, 6 (providing that new restrictions become effective November 17, 2020); Proclamation 20-25.9, Ex. 1, at 3, 6 (providing that the temporary restrictions will expire on January 4, 2020, and that the remaining prohibitions from Proclamations 20-25, *et seq.* will remain in effect).

For example, restaurants and taverns aptly demonstrate the Governor's discrimination. Justice Gorsuch, who joined in the majority opinion in *Diocese of Brooklyn*, described Governors' orders privileging "restaurants . . . over churches, mosques, and temples" as a "radical [ ] departure from the First Amendment's terms and long settled rules about its application." *Diocese of Brooklyn*, 2020 WL 6948354, at *5 (Gorsuch, J., concurring) (cleaned up). Indeed, courts broadly agree that gatherings at restaurants are comparable to religious gatherings. *E.g.*, *Soos* v. *Cuomo*, No. 1:20-cv-651, 2020 WL 3488742, at *11 (N.D.N.Y. June 26, 2020); *Antietam Battlefield KOA* v. *Hogan*, No. 1:20-cv-01130, 2020 WL 2556496, at *9 (D. Md. May 20, 2020); *Calvary Chapel of Bangor* v. *Mills*, No. 1:20-cv-00156, 2020 WL 2310913, at *8 (D. Me. May 9, 2020); *Cross Culture Christian Ctr.* v. *Newsom*, No. 2:20-cv-00832, 2020 WL 2121111, at *6 (E.D. Cal. May 5, 2020); *Maryville Baptist Church* v. *Beshear*, No. 3:20-cv-278, 2020 WL 1909616, at *2 (W.D. Ky. Apr. 18, 2020). Restaurants are "comparable" to indoor religious services because they involve "large groups of people [who] gather in close proximity for

extended periods of time." *See S. Bay*, 2020 WL 2813056, at *1. Here, although the current "temporary" guidance prohibits indoor dining through January 4, 2020, the prior restrictions—which were in effect when the Churches filed their complaints, and which will soon resume—allow restaurants and taverns to operate at 50% capacity without any numerical cap, so long as there are 6 people per table (who may be from different households). *See* Restaurant Guidance, ECF No. 33-19 at 1-2.

Manufacturing facilities present another illuminating example. In *Diocese of Brooklyn*, the Supreme Court held that subjecting religious services to a hard numerical cap while designating chemical manufacturing plants as "essential" constitutes "disparate treatment" that renders the restrictions "not neutral and of general applicability." *See* 2020 WL 6948354, at *2. Here, Governor Inslee categorized many manufacturing plants as "essential," and even "non-essential" manufacturing plants may continue operations with no capacity or numerical restrictions, subject only to social distancing and hygiene protocols. *See* Essential Workers List, ECF No. 33-4 at 1-12; Manufacturing Guidance, ECF No. 33-19 at 1-4.

Governor Inslee's discriminatory treatment extends far beyond restaurants and manufacturing plants. While houses of worship are limited to 25% capacity with a 200-person cap, a more generous 50% capacity allowance (without any numerical cap) applies to professional offices and personal services like tattoo parlors and salons. *See* Current Reopening Plan, ECF No. 33-17 at 12; Professional Services Guidance, ECF No. 33-20 at 3; Personal Services Guidance, ECF No. 33-21 at 3. "Miscellaneous venues" in Phase 2 counties—including conference

centers, convention halls, hotel meeting ballrooms, and sporting arenas—may reach 30% capacity, up to 200 people. *See* Miscellaneous Venue Guidance, ECF No. 33-23 at 1. And movie theaters in Phase 2 counties may operate at 25% capacity with no numerical cap. *See* Current Reopening Plan, ECF No. 33-17 at 12; Movie Theater Guidance, ECF No. 33-22 at 1.

Finally, Defendants' de facto exemptions also include protest gatherings, which the Governor admits present "increased risks."[9] Governor Inslee issued statements expressing support for "thousands" of people in Washington to "gather" in protest. *See* May 31, 2020 Inslee Statement, ECF No. 33-24; May 30, 2020 Inslee Statement, ECF No. 33-25. Instead of enforcing his gathering or social distancing restrictions, Governor Inslee expressed his mere "hope" that protestors might wear a mask and "distance *as much as you can*."[10] In reality, the protests looked like this[11]:

---

[9] *Supra* note 7.

[10] *Supra* note 5.

[11] *Supra* note 4.



When it comes to protest gatherings, Governor Inslee permits thousands to gather in violation of his orders, but he will not grant churches the same accommodation.

The Governor's failure to restrict the above-referenced secular activities demonstrates that the restrictions on churches are not generally applicable.

## 2. The religious restrictions trigger strict scrutiny because they are not neutral.

The religious restrictions trigger strict scrutiny for another independent reason: they are not neutral. Neutrality and general applicability are separate but interrelated, and failure to satisfy one requirement is a likely indication that the other has not been satisfied. *Lukumi*, 508 U.S. at 521.

As a threshold matter, the religious restrictions are not facially neutral. The virus does not care whether the purpose of a gathering is commercial, cultural, political, or religious. But instead of issuing neutral

orders regulating the size, duration, and conduct for all gatherings, the Governor's orders impose unique restrictions on "religious services." *See* Proclamation 20-25.9, Ex. 1, at 4. And the Governor issues unique guidance documents to single out gatherings held by "Religious and Faith-based Organization[s]," repeatedly maligning "spiritual gatherings" as "COVID-19 'superspreader' events" that should continue to be held remotely. *See, e.g.,* First Religious Guidance, ECF No. 33-13 at 1; Second Religious Guidance, ECF No. 33-14 at 1. The Governor's orders trigger strict scrutiny by facially singling out religious conduct for uniquely adverse treatment.

Furthermore, "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 534). In *Diocese of Brooklyn*, the Supreme Court held that COVID-19 restrictions fail the neutrality requirement when they "they single out houses of worship for especially harsh treatment" by imposing hard numerical caps and a "non-essential" categorization for religious services while granting and "essential" categorization and/or more favorable restrictions for secular activities. *See Diocese of Brooklyn*, 2020 WL 6948354, at *1. The Supreme Court has also explained that a law or rule is not neutral if it visits "gratuitous restrictions on religious conduct"; results in a "religious gerrymander" that in practical effect singles out religious practices for worse treatment; *or* treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons. *Lukumi*, 508 U.S. at 533–35. The Supreme Court's free-exercise decisions therefore demand

that this Court "survey meticulously," *Lukumi*, 508 U.S. at 534, the risks and character of the businesses and activities that the State continues to allow.

Here, the religious restrictions single out churches for adverse treatment and treat the same conduct as lawful when undertaken for secular purposes. Only religious services were maligned as "superspreader events even though COVID-19 outbreaks have been traced to many of the secular activities receiving favorable treatment, including restaurants, offices, manufacturing and food-processing facilities, nail salons, and hair salons. *See* Media Reports Tracing Outbreaks to Secular Businesses, attached as **Exhibit 10**." Indeed, many secular operations are subject to neither capacity nor numerical restrictions. Further, the State imposes unique restrictions on churches even when they can hold services in accordance with social-distancing and safety guidelines that the State accepts as sufficient for many secular businesses and activities. The Churches have voluntarily adopted procedures more than adequate to this end. *See* Second Am. V. Compl. ¶¶ 42-46.

The State trusts its residents to socially distance and follow general health and safety guidelines while gathering together on a *daily* basis for secular activities, but it does not trust them to do so even once a week if the purpose of their gathering is religious. "Come to think of it, aren't the two groups of people often the *same people*—going to work on one day and going to worship on another? *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) (emphasis in original). "How can the same person be trusted to comply with social-distancing and other health guidelines in secular

settings but not be trusted to do the same in religious settings? The distinction defies explanation, or at least the Governor has not provided one." *Id.* This double standard is unconstitutional. *See id.*; *Lukumi*, 508 U.S. at 547 (strict scrutiny should apply "even upon slight suspicion" that "state intervention" stems from "distrust of [religious] practices"); *Masterpiece Cakeshop*, 138 S. Ct. at 1731 ("The Constitution commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures.") (internal quotations omitted).

### 3. The religious restrictions trigger strict scrutiny because they involve a system of individual exemptions.

The religious restrictions also trigger strict scrutiny because they arise out of "a system of individual exemptions." *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990). In *Smith*, the Supreme Court concluded that laws burdening religious exercise trigger strict scrutiny if they are not "neutral" towards religion or "of general applicability." *Id.* at 879. Applying that test, the Court held that the Free Exercise Clause did not prohibit the government from denying unemployment benefits to a worker fired for using illegal drugs, even if the drugs were used for religious reasons. *Id.* at 890. In so doing, the Court was careful to distinguish neutral, generally applicable drug laws from laws allowing a government official to make an "individualized . . .

assessment of the reasons for the relevant conduct." *Id.* at 882–84 (citing cases).

In explaining this distinction, the Court discussed *Sherbert v. Verner*, 374 U.S. 398 (1963), which involved an unemployment compensation law that allowed the government to deny unemployment benefits if the person refused work "without good cause." *Smith*, 494 U.S. at 884. The Court explained that strict scrutiny properly applied in *Sherbert* because the law's "good cause" inquiry "created a mechanism for individualized exemptions" depending on a government official's discretion. *Id.* at 884–85. "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.* at 884.

This case falls squarely within the "individualized assessments" exception to *Smith*. By declaring a state of emergency, the Governor has given himself unbridled discretion to grant individualized exemptions from any gathering restrictions. And as explained above, the Governor has exercised that unfettered discretion. He has excused "essential" activity and even some "non-essential" activity from capacity and numerical restrictions, while refusing to extend a similar accommodation to the Churches' worship services.

Because the Governor's exercise of his emergency powers has resulted in a system of "individual exemptions," the government cannot "refuse to extend that system to cases of 'religious hardship'" without surviving strict scrutiny. *Smith*, 494 U.S. at 884.

### 4. Neither *Jacobson* nor *South Bay* gives the government license to treat the Churches worse than restaurants and other comparators.

Defendants may contend that, under *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), or *South Bay*, strict scrutiny does not apply because the religious restrictions are an exercise of the Governor's emergency police powers. In *Jacobson*, the Supreme Court upheld a neutral, across-the-board smallpox requirement, recognizing that elected officials bear primary responsibility for laws involving public health. *See* 197 U.S. at 12-13. In *South Bay*, Chief Justice Roberts published a concurring opinion denying a church's emergency application for injunctive relief from COVID-19 restrictions limiting worship services to 25% capacity or 100 people. *See S. Bay*, 2020 WL 2813056, at *1. In his *South Bay* concurrence, Chief Justice Roberts cited *Jacobson* for the proposition that "our Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States to guard and protect," and found that secular activities receiving more favorable treatment were not comparable because they did not involve large groups gathering in close proximity for extended periods of time. *See id.* (internal quotations omitted).

But the Supreme Court's recent decision in *Diocese of Brooklyn* forecloses such an argument. Foregoing any reference to *Jacobson*, the Supreme Court *Diocese of Brooklyn* relied on *Lukumi*'s "minimum requirement of neutrality" standard and concluded that New York's regulations missed the mark. 2020 WL 6948354, at *1–*2. The majority's silence about *Jacobson* is particularly telling. And if there were any doubt

after reading the majority opinion about whether *Jacobson* holds any place in modern constitutional analysis, Justice Gorsuch's concurrence and Chief Justice Roberts' dissent collectively put the question to rest.

Justice Gorsuch criticized the concurrence in *South Bay* for "reach[ing] back 100 years . . . to grab hold of our decision in *Jacobson*" to justify the denial of the South Bay's emergency application. *Diocese of Brooklyn*, 2020 WL 6948354, at *5 (Gorsuch, J., concurring). Doing so was a mistake, Justice Gorsuch said, because *Jacobson* "involved an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction." *Id*. No Justice disagreed with that assessment, including the Chief Justice, who authored the *South Bay* concurrence. About his *South Bay* opinion, the Chief Justice noted that *Jacobson* "warranted exactly one sentence," and an "uncontroversial" one at that. *Id*. at *9 (Roberts, C.J., dissenting). That uncontroversial assertion? "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring) (quoting *Jacobson*, 197 U.S. at 38). To read anything more into that solitary *Jacobson* reference, the Chief Justice wrote, requires one to "reach beyond the words themselves . . . ." *Diocese of Brooklyn*, 2020 WL 6948354, at *9 (Roberts, C.J., dissenting).

Importantly, the Supreme Court has now granted emergency injunctive relief for houses of worship on *three* occasions, vacating appellate decisions upholding COVID-19 restrictions and remanding with instructions that the courts reconsider in light of the Supreme Court's *Diocese of Brooklyn* decision. *See Harvest Rock Church v.*

1  *Newsom*, No. 20A94, 2020 WL 7061630 (U.S. Dec. 3, 2020); *High Plains*
2  *Harvest Church v. Polis*, No. 20A105, 2020 WL 7345850 (U.S. Dec. 15,
3  2020); *Robinson v. Murphy*, No. 20A95, 2020 WL 7346601 (U.S. Dec. 15,
4  2020).

5  For these reasons, *Jacobson* provides no support for Defendants'
6  view that the challenged orders and guidance escape strict scrutiny in
7  favor of a more deferential standard of review. Instead, *Diocese of*
8  *Brooklyn* "makes . . . plain" that "courts must resume applying the Free
9  Exercise Clause." *Diocese of Brooklyn*, 2020 WL 6948354, at *5 (Gorsuch,
10 J., concurring).[12]

11 ## B.  The religious restrictions violate the Churches' free
12 speech and assembly rights.

13 Religious speech is protected under the First Amendment. *See, e.g.*,
14 *Widmar v. Vincent*, 454 U.S. 263, 269 (1981); *Lovell v. City of Griffin,* 303
15 U.S. 444 (1938). And the government may not restrict private speech on
16 private property, religious or otherwise, without satisfying strict
17 scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155 (2015) (town's sign
18 ordinance restricting speech "on private property or on a public right of
19 way" subject to strict scrutiny). Because the Church's services consist
20 entirely of protected expression and speech, the Religious Restrictions

21 _____

22 [12] For an exhaustive treatment of *Jacobson*'s application before and after
23 the Supreme Court's decision in *Diocese of Brooklyn*, *see* Brief of Religious
24 Organizations as *Amici Curiae* in Support of Petitioner, *Calvary Chapel*
25 *Dayton Valley v. Sisolak*, No. 20-637 (U.S. Dec. 10, 2020), attached as
26 **Exhibit 11**.

restrict speech and trigger strict scrutiny. *See S. Oregon Barter Fair v. Jackson Cnty., Or.*, 372 F.3d 1128 (9th Cir. 2004) ("religious ceremonies" are "expressive").

In addition, the Governor's orders restrict religious expression but do not impose a similar restriction on expressive activities performed at protest events. Like church services, Governor Inslee notes that protest gatherings enjoy speech and assembly rights under the First Amendment. *See* May 30, 2020 Inslee Statement, ECF No. 33-25. Like church services, protests involve people "gathering" to "listen to speeches."[13] But Governor Inslee applauded protest gatherings involving "thousands" of people based on his belief that they carried an "important message," while maintaining a strict 200-person limit on indoor religious services and a 100-person limit on outdoor services. May 31, 2020 Inslee Statement, ECF No. 33-24.

Governor Inslee publicly admitted that supporting protest gatherings while prohibiting other gatherings does "appear to be contradictory,"[14] and explained that his preferential treatment related to the *content* of the speech: "thousands of people have made a decision that the virus of racism is important enough to fight back by peaceful protests and we have encouraged them to do so in the most distanced manner as possible . . . ."[15] Meanwhile, the Churches—who enjoy the same First Amendment rights—would be subject to imprisonment and fines if they

---

[13] *Supra* note 4.

[14] *Supra* note 6.

[15] *Supra* note 6.

made an identical decision that the virus of sin (including racism) is important enough to fight back through religious speech and assembly. Governor Inslee stated that for protesters—but apparently not for the Churches—"there are *some* First Amendment rights that we have respected even though we do understand there have been some increased risks in any large gathering and we have respected people's rights in that regard . . . ."[16] Such a content- and viewpoint-based restriction triggers strict scrutiny. *See Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 746 (9th Cir. 2012) (content-based restriction triggers strict scrutiny). As explained below, the Defendants cannot satisfy that rigorous standard.

## C. The religious restrictions fail strict scrutiny.

"Because the challenged restrictions are not neutral and of general applicability, they must satisfy strict scrutiny, and this means that they must be narrowly tailored to serve a compelling state interest." *Diocese of Brooklyn*, 2020 WL 6948354, at *2 (citing *Lukumi*, 508 U.S. at 546) (internal quotations omitted). Slowing the spread of COVID–19 is certainly a compelling interest. *Id.* But "a law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (internal markings omitted). In *Diocese of Brooklyn*, the Supreme Court held that restrictions imposing a hard numerical cap on religious services are not narrowly tailored—and therefore, fail strict scrutiny—where the government could use building capacity restrictions

---

[16] *Supra* note 7.

1    (without a hard numerical cap) already approved as sufficiently safe for
2    secular indoor gatherings. *See id.* This is especially true when religious
3    plaintiffs are willing to comply with standard health and safety protocols.
4    *See id.*

5         Defendants cannot satisfy strict scrutiny for two reasons. First, as
6    detailed above, the Governor has exempted numerous secular activities
7    and facilities from the gathering restriction currently placed on houses of
8    worship. *See Lukumi*, 508 U.S. at 536–38 (concluding that when the same
9    conduct "in almost all other circumstances [goes] unpunished," religious
10   conduct has been unconstitutionally "singled out for discriminatory
11   treatment"). This fact alone justifies injunctive relief.

12        Second, the religious restrictions are not narrowly tailored to the
13   least restrictive means possible to achieve the government's interest.
14   Governor has offered no justification for why compliance with social-
15   distancing and hygiene requirements on the part of churches would not
16   satisfy the government's public health interest. Indeed, the continued
17   reliance on social-distancing and hygiene restrictions for similar secular
18   activities proves that the additional restrictions and burdens placed on
19   religious services are not the least-restrictive way to satisfy the State's
20   purported interest. With respect to complete ban on indoor
21   congregational singing—which predominately impacts houses of
22   worship, and which infringes on the Churches' religious belief that
23   singing and musical instruments are required for worship, *see* Ex. 2, ¶
24   29; Ex. 3, ¶ 27—the state could achieve its interests by limiting the time
25   for singing and/or by requiring singers and musicians to stand even
26   further than six feet apart. Instead, Defendants' guidance issues an

overbroad prohibition of *all* indoor congregational singing and micromanages the particular number and type of instruments allowed for accompaniment. Because Defendants cannot withstand strict scrutiny, a preliminary injunction should issue.

## II.   The Church has already suffered and will continue to suffer irreparable harm without an injunction.

The Supreme Court recognizes that "the deprivation of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Diocese of Brooklyn*, 2020 WL 6948354, at \*3 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). And restrictions imposing a hard numerical cap on religious services cause irreparable injury by barring congregants, especially because "remote viewing is not the same as personal attendance." *Id.* As detailed above, the Religious Restrictions have already violated the Churches' constitutional rights. The Religious Restrictions have also harmed (and continue to harm) the Churches' ministries by suspending weddings, baptisms, services for vulnerable populations, membership vows, support for youth, and church leadership meetings. *See id.*, ¶ 108.

## III.   The balance of equities sharply favors the Churches.

The equities favor the Churches because the law places a premium on protecting constitutional rights and because the government has deemed less restrictive means sufficient to protect public health in many comparable contexts. The Religious Restrictions irreparably harms the Churches' constitutional rights and significantly hinders their ability to minister to their parishioners and communities. Meanwhile, an injunction need not harm Defendants at all. Local health officials can

subject infected persons to orders of isolation and quarantine and the State remains free to adopt neutral and reasonable gathering restrictions, including narrowly tailored social distancing and health and safety measures. But a 25% capacity restriction and a flat ban on services involving more than 200 people—regardless of the physical capacity of the church or the protective measures in place—serves no governmental interest and is not narrowly tailored.

## IV.   An injunction will serve the public interest.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002. This is particularly true for First Amendment freedoms. Because the requested injunction will accomplish this, the public interest also favors an order protecting the Churches.

## CONCLUSION

For these reasons, the Churches respectfully request that this Court grant this motion to enjoin the capacity restrictions, hard numerical caps, and musical restrictions in the religious orders and guidance in effect since the Churches filed their Second Amended Verified Complaint—Proclamations 20-25.7, 20-25.8, 20-25.9, as well as the third and fourth religious guidance documents—and at the very least extend to the Churches a 50% capacity limit with no hard cap, as the State has done for other activities in the state.

Respectfully submitted this 16th day of December 2020.

s/ Ryan J. Tucker
Kristen K. Waggoner, WA Bar 27790
Ryan J. Tucker (AZ Bar 034382)*
Jeremiah Galus (AZ Bar 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ  85260
Telephone: (480) 444-0020
kwaggoner@adflegal.org
rtucker@adflegal.org
jgalus@adflegal.org

David A. Cortman (GA Bar 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org

*Admitted pro hac vice

1

## Certificate of Service

2

3        I hereby certify that on the 16th day of December, 2020, the

4    foregoing was filed with the Clerk of Court using CM/ECF system, which

5    in turn automatically generated a Notice of Electronic Filing to all parties

    in the case who are registered users of the CM/ECF system.

6

7                                          <u>s/ Ryan J. Tucker</u>

8                                          Ryan J. Tucker, AZ Bar 034382*

9                                          ALLIANCE DEFENDING FREEDOM

10                                         15100 N. 90th Street

11                                         Scottsdale, AZ  85260

12                                         Telephone: (480) 444-0020

13                                         rtucker@adflegal.org

14

15

16

17

18

19

20

21

22

23

24

25

26